# In the United States Court of Federal Claims

No. 15-995C
(Filed: January 10, 2019)

| | |
|---|---|
| MICHAEL C. BAILEY et al., Plaintiffs, v. THE UNITED STATES, Defendant. | Fair Labor Standards Act, 29 U.S.C. §§ 201-209; Judgment Fund, 31 U.S.C. § 1304; RCFC 56; Summary Judgment |

Gregory K. McGillivary, Washington, DC, for plaintiffs.

Molly L. Finnan, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

Plaintiffs Michael Bailey and Jason Hughes, employed by the United States Department of Homeland Security as Customs and Border Protection ("CBP") canine handlers, seek payment from defendant for overtime work performed without compensation between 2013 and 2016 pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), ch. 676, 52 Stat. 1060 (codified as amended at 29 U.S.C. §§ 201-219 (2012)). During settlement negotiations, defendant questioned whether it could compensate plaintiffs beyond a cap on overtime payments established in appropriations acts covering the relevant period (collectively, "Appropriations Acts"). The parties filed cross-motions for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC") regarding the effect the Appropriations Acts have on plaintiffs' ability to recover overtime pay pursuant to the FLSA and defendant's ability to settle such a claim. For the reasons articulated below, the court finds that the Appropriations Acts, which establish a cap on CBP overtime pay, prohibit plaintiffs from receiving overtime payments that exceed $35,000 per annum.

## I. BACKGROUND

On September 19, 2015, eight CBP canine handlers filed suit in this court seeking payment for overtime work performed, but not compensated. See generally Compl. An amended complaint, filed on August 5, 2016, increased the number of plaintiffs to 291. See Am. Compl. 1-13. In the amended complaint, plaintiffs allege that they are or were employees within the meaning of the FLSA pursuant to 29 U.S.C. § 203(e)(1), and that CBP is also subject to the

FLSA as an employer pursuant to 29 U.S.C. §§ 203(d) and 203(x). Id. ¶¶ 4-5. Plaintiffs further allege that under the terms of the FLSA, as law enforcement officers receiving Administratively Uncontrollable Overtime pay, they are entitled to one and one-half times their regular rate of pay for each hour worked in excess of 85.5 hours in a fourteen-day work period. Id. ¶ 7. According to plaintiffs, CBP failed to properly compute their overtime, caused or suffered them to work in excess of allowable overtime, and, in some cases, instructed them to improperly calculate their hours worked to avoid documenting overtime performed. Id. ¶¶ 12-19.

On October 15, 2016, plaintiffs and defendant filed a consent motion to dismiss sixteen plaintiffs from the action. See Consent Mot. to Dismissal of Sixteen Pls. 1. Subsequently, the parties began settlement negotiations, and on June 12, 2018, they jointly stipulated to dismiss an additional 273 plaintiffs whose claims were resolved through settlement. See Joint Stipulation of Dismissal of Two Hundred Seventy-Three (273) Pls. 1. The two remaining plaintiffs, Messrs. Bailey and Hughes, did not reach a settlement with defendant due to a dispute over the applicability of the overtime pay caps in the Appropriations Acts. Pls.' Cross-Mot. 1. Mr. Bailey seeks overtime pay of $30,401.78 and Mr. Hughes seeks overtime pay of $33,631.52, amounts that would cause them to receive overtime pay in excess of the caps. Def.'s Mot. Summ. J. 3-4. The parties do not dispute that Messrs. Bailey and Hughes performed the work underlying these claims.

On May 4, 2018, defendant moved for partial summary judgment, arguing that awarding the two remaining plaintiffs overtime pay of more than $35,000 per annum would impermissibly exceed the overtime pay caps in the Appropriations Acts. See generally id. Defendant argues that both plaintiffs were previously entitled to at least some overtime compensation during the relevant time frame, such that the caps potentially limit the amount of money they can recover. Id. at 2-4, 11-14, App. 14-15. In particular, defendant contends that the portion of the proposed settlement that is intended to compensate for the overtime pay claims is subject to the caps. Id. at 2-4, App. 14-15.

Defendant offers several arguments in support of its view that the Appropriations Acts bar settlement payments that would exceed $35,000 per annum. First, defendant argues that the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has recognized that overtime pay caps establish firm statutory maximum amounts for retirement calculations, referencing Grover v. OPM, 828 F.3d 1378 (Fed. Cir. 2016), and in FLSA compensation, relying on Bull v. United States, 479 F.3d 1365, 1372-75, 1378 (Fed. Cir. 2007). See Def.'s Mot. Summ. J. 15-17. Defendant asserts these decisions demonstrate that the Federal Circuit views the caps as absolute, including in FLSA cases. Id. at 17. Defendant also contends that the Appropriations Acts demonstrate clear congressional intent to amend CBP's statutory obligations. Id. at 18-19. Defendant relies on United States v. Dickerson, 310 U.S. 554, 555 (1940), and United States v. Will, 449 U.S. 200, 202 (1980), for the proposition that appropriations acts, coupled with supporting legislative history, can supersede permanent legislation. Def.'s Mot. Summ. J. 18. Defendant further contends that a plain-language reading of the Appropriations Acts and prior legislation shows unambiguous congressional intent to impose an overtime ceiling within each fiscal year. Id. at 19, 23-26. Lastly, defendant argues that the caps established in the Appropriations Acts prevent payment for plaintiffs' claims in any case, arguing that the Judgment Fund cannot "pick up the slack" because "[t]he Judgment Fund

is only available for payments of final judgments entered upon a finding of liability in the first instance, which cannot exist in light of the statutory cap at issue here." Id. at 26-27.

Defendant proposes two monetary amounts to settle the claims of each of the remaining plaintiffs. Id. at 2-4. One amount does not cause the specified plaintiff to exceed the $35,000 per annum overtime pay caps, and the other is an amount that would exceed those caps. Id. Defendant explains that it is prepared to settle in either amount, but first requires a determination from the court as to whether the caps restrict the amount it may pay for overtime compensation. Id.

In their cross-motion for partial summary judgment, plaintiffs disagree with defendant that the Appropriations Acts prevent them from receiving compensation for their overtime work. Pls.' Cross-Mot. Summ. J. 8. Plaintiffs argue that the FLSA requires that employers must pay employees for all hours worked. Plaintiffs contend that waivers of FLSA rights must be "clear and unmistakable." Id. at 12 (citing Wright v. Universal Mar. Serv. Co., 525 U.S. 70, 80 (1998)). Plaintiffs further argue that exemptions from the FLSA are "express and enumerated," and for an employee to be exempted, "the employee's position must fall within the 'fair reading' of the exemption contained within the FLSA." Id. (citing Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018)). Plaintiffs contend that they were not exempted from the FLSA until January 2016, the end date of plaintiffs' overtime claims. Id. at 12-13. Therefore, plaintiffs argue, the Appropriations Acts do not defeat their rights under the FLSA. Id. at 13.

Plaintiffs instead contend that the FLSA may be read harmoniously with the Appropriations Acts because backpay settlements are not counted toward the overtime pay caps pursuant to the applicable regulation. Id. at 14, 18-20 (citing 19 C.F.R. § 24.16(h) (2004)). Further, plaintiffs assert that the statutory source of the appropriations does not enable defendant to avoid FLSA liability. Id. at 15. Finally, plaintiffs contend that the caps are not violated because funds for settlements do not come from those appropriations, but from the Judgment Fund, which is a separate appropriation. Id. at 12-22.

The parties each proffered additional arguments in favor of their positions. To the extent these arguments are not included here, the court finds them unnecessary to adjudicate the parties' motions. Deeming oral argument unnecessary, the court is prepared to rule.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. at 324. Both parties may carry their burden by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the court must not weigh the evidence or make findings of fact. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.").

Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. However, if neither party satisfies this burden on the filing of cross-motions for summary judgment, then the court must deny both motions. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir. 2003) ("When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving reasonable inferences against the party whose motion is under consideration."); Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other.").

## III. DISCUSSION

With their cross-motions for partial summary judgment, the parties seek a ruling on a narrow issue: whether the Appropriations Acts restrict the government's ability to settle FLSA claims for amounts that exceed the overtime pay caps. To address this issue, the court first describes the various statutory schemes for paying overtime to CBP employees.

### A. CBP Overtime Pay

The pay regime for employees of CBP—the successor to the United States Customs Service ("Customs")—has a long history, which was summarized by the Federal Circuit in Bull. See 479 F.3d at 1370-75. That summary, supplemented with additional relevant information, provides useful context for this case.

In the late eighteenth century, Customs inspectors (the historical antecedents of today's CBP employees) were primarily paid using fees collected from private parties for inspection services. Id. at 1370. Because the nature of transportation in that era was unpredictable, Congress passed legislation directing the Secretary of the Treasury to create regulations authorizing additional compensation—through higher fees—for inspection services during nighttime hours. Id. at 1370-71. In 1911, Congress enacted a statute ("Act of 1911") directing the Secretary of the Treasury to "fix a reasonable rate of extra compensation" for Customs officers performing such after-hours inspection duties. Id. (quoting Act of Feb. 13, 1911, ch. 46, § 5, 36 Stat. 899, 901).

Congress amended this legislation in 1920, authorizing generous overtime compensation. Id. The changes to the statute could, for example, enable a Customs inspector to "receive four hours' pay (one-half day's pay) by working one additional hour beyond 5:00 p.m., and sixteen hours' pay (two days' pay) by working only a few minutes on Sunday or a holiday."[1] Id. Customs regulations implementing the Act of 1911 were also generous. Id. However, if overtime occurred "during customary working hours or during the first hour after 5:00 p.m. . . . [an officer] was supposed to be compensated (at least in later years) pursuant to the overtime provisions of" the Federal Employees Pay Act of 1945 ("FEPA"), Pub. L. No. 79-106, 59 Stat. 295 (codified as amended in scattered sections of titles 2 and 5 of the United States Code), and the FLSA. Bull, 479 F.3d at 1371 (citations omitted).

The FEPA provides overtime compensation to covered federal employees under certain circumstances. If an employee's hours exceed forty hours in an administrative work week, those employees may receive 1.5 times their normal pay rate for the excess hours if the work was "officially ordered or approved." 5 U.S.C. § 5542(a) (2012 & Supp. II).

The FLSA also allows federal employees to receive 1.5 times their normal pay rate for work hours that exceed forty hours in an administrative work week. 29 U.S.C. §§ 203(d), 207(a). Unlike the FEPA, however, a claim pursuant to the FLSA does not require that employees demonstrate that claimed overtime work was preapproved in writing, but instead requires only that the employer "suffered or permitted" performance of the overtime. Bull, 479 F.3d at 1378. The Office of Personnel Management administers the FLSA for federal entities. See 29 U.S.C. § 204(f). Civil service regulations define "suffered or permitted work" as "any work performed by an employee for the benefit of an agency, whether requested or not, provided the employee's supervisor knows or has reason to believe that the work is being performed and has an opportunity to prevent the work from being performed." 5 C.F.R. § 551.104 (2007); see also 29 U.S.C. § 203(g) ("'Employ' includes to suffer or permit to work."). Exemptions to the FLSA are enumerated in 29 U.S.C. § 213.

[1] This level of pay was possible because the increments in which pay accrued were large, irrespective of the amount of work actually performed. See Bull, 479 F.3d at 1371. Increments for overtime work during the work week were half days, meaning that an employee could work one hour, yet receive compensation for four. See id. Pay for Sunday and holidays was remunerated in two-day increments, meaning that an employee could receive two days' pay for working a single hour on a holiday. See id.

In 1976, Congress "shifted the financial responsibility for overtime charges incurred on Sundays and holidays to the Federal Government." Bull, 479 F.3d at 1372. Concerned by the rising cost of overtime and the effect of long work hours on Customs inspectors, the House Committee on Appropriations proposed a limit on the amount of overtime any Customs employee could receive. Id. at 1372. A cap was established in a 1979 appropriations act, limiting the amount of overtime pay for all Customs employees to $20,000. Id. at 1373. Later, in the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Congress directed Customs to collect user fees, which were then used to pay overtime expenses. Id. The COBRA created a pool of fees large enough to more than cover Customs overtime expenses. Id. However, a subsequent Government Accountability Office ("GAO") investigation revealed that the fee account was not being managed properly, and that employees were sometimes overcompensated, or compensated at an incorrect rate, e.g., incorrectly receiving "Act of 1911" rates when FLSA or FEPA rates were applicable. Id. at 1374. In response to the GAO investigation, Congress enacted what is referred to as the Customs Officer Pay Reform Act ("COPRA"). Id.

The COPRA was enacted as part of the Omnibus Budget Reconciliation Act of 1993. See Pub. L. No. 103-66, §§ 13811-13813, 107 Stat. 312, 668-72 (codified as amended at 19 U.S.C. §§ 261, 267). The COPRA amended the Act of 1911 to provide for double-time pay rates for officially assigned overtime work and to replace the Act of 1911's pay increments with premium pay. Id. The COPRA also provided that Customs employees cannot receive compensation for "officially assigned" overtime from any other provision of law, id. § 13811(a), 107 Stat. at 670 (codified as amended at 19 U.S.C. 267(c)(2) (2012)), effectively displacing the FEPA for them. Bull, 479 F.3d at 1378. Further, the COPRA codified an overtime pay cap for Customs officers, providing that the "aggregate of overtime pay . . . that a [C]ustoms officer may be paid in any fiscal year may not exceed $25,000 . . . ." Pub. L. No. 103-66, § 13811(a), 107 Stat. at 670 (codified as amended at 19 U.S.C. § 267(c)(1)). The Federal Circuit explained in Bull that "[i]t was Congress' intent that this new pay-rate regime, coupled with the promulgation of Treasury Department regulations designed to prevent abuse of the overtime system, would mirror FEPA and FLSA in the sense that payment would reflect the amount of time actually worked." 479 F.3d at 1374 (citations omitted). The COPRA, however, does not displace the FLSA. See id. at 1378 ("[F]or 'officially assigned' overtime, COPRA is the exclusive source of remuneration, but for other overtime work suffered or permitted, FLSA remuneration is available.").

The overtime pay cap codified by the COPRA at 19 U.S.C. § 267 was increased to $35,000 in 2005. See Department of Homeland Security Appropriations Act, 2005, tit. II, Pub. L. No. 108-334, 118 Stat. 1298, 1300 (2004). The Appropriations Acts maintained this $35,000 cap. See Department of Homeland Security Appropriations Act, 2016, div. F, tit. II, Pub. L. No. 114-113, 129 Stat. 2242, 2495 (2015); Department of Homeland Security Appropriations Act, 2015, div. F, tit. II, Pub. L. No. 114-4, 129 Stat. 39, 41; Department of Homeland Security Appropriations Act, 2014, div. F, tit. II, Pub. L. No. 113-76, 128 Stat. 5, 249; Department of Homeland Security Appropriations Act, 2013, div. D, tit. II, Pub. L. No. 113-6, 127 Stat. 198, 345; Department of Homeland Security Appropriations Act, 2012, div. D, tit. II, Pub. L. No. 112-74, 125 Stat. 786, 946 (2011). In addition, the Appropriations Acts include language

extending the $35,000 cap to overtime pay from all sources. Id. Specifically, each Act provided that for the relevant fiscal year,

> the overtime limitation prescribed in [19 U.S.C. § 267(c)(1)] shall be $35,000; and notwithstanding any other provision of law, none of the funds appropriated by this Act shall be available to compensate any employee of U.S. Customs and Border Protection for overtime, from whatever source, in an amount that exceeds such limitation, except in individual cases determined by the Secretary of Homeland Security, or the designee of the Secretary, to be necessary for national security purposes, to prevent excessive costs, or in cases of immigration emergencies[.]

Id. In other words, the Appropriations Acts prohibited the use of appropriated funds to pay overtime to CBP employees beyond the cap it established for that fiscal year. Id.

Each plaintiff proffers different dates for which they are claiming overtime pay; however, the disputed overtime in both plaintiffs' claims occurred within fiscal years 2013 through 2016.[2] Thus, resolving the question of whether the Appropriations Acts limit the federal government's liability under the FLSA and ability to settle is dispositive to both cases. The court therefore reviews both plaintiffs' claims in a single analysis.

### B. The Appropriations Acts Evince Congressional Intent to Limit FLSA Claims

When an appropriation includes language restricting funds to pay a legal liability, this restriction on the use of funds does not per se remove that legal liability, only the means to pay it with that appropriation. See Greenlee Cty. v. United States, 487 F.3d 871, 880 (Fed. Cir. 2007) ("We conclude that the government's liability for . . . payments was limited to the amounts appropriated by Congress." (emphasis added)). Defendant's obligation to pay overtime manifested when the terms entitling employees covered by the FLSA to overtime pay were satisfied. The Appropriations Acts uniformly state that "none of the funds appropriated by this act . . . may be available to compensate . . . for overtime," which is language limiting payment, not eliminating a substantive right to compensation altogether. See Appropriations Acts.

Nevertheless, defendant argues that the Appropriations Acts "substantively amend[] FLSA . . . to limit plaintiffs' entitlement" to compensation. See Def.'s Mot. Summ. J. 30. The United States Supreme Court ("Supreme Court") generally disfavors repeal or amendment by implication: "The Court has had frequent occasion to note that . . . indefinite congressional expressions cannot negate plain statutory language and cannot work a repeal or amendment by implication. 'In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable.'" St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772, 787-88 (1981) (quoting Morton v. Mancari, 417 U.S. 535, 550 (1974)); accord Posadas v. Nat'l City

[2] Mr. Bailey seeks overtime pay from April 21, 2013, through January 9, 2016; Mr. Hughes seeks overtime pay from March 10, 2013, through January 9, 2016. Def.'s Mot. Summ. J. 3.

Bank, 296 U.S. 497, 503 (1936).  The Supreme Court has also consistently held that exceptions to the FLSA are to be narrowly construed:

> In the past, the Court has refused "[t]o extend an exemption to other than those plainly and unmistakably within [the FLSA's] terms and spirit."  A.H. Phillips, Inc. v. Walling, 324 U.S. 490, 493 (1945).  Similarly, where the FLSA provides exemptions "in detail and with particularity," we have found this to preclude "enlargement by implication."  Addison v. Holly Hill Fruit Products, Inc., 322 U.S. 607, 617 (1944).  See also Powell v. United States Cartridge Co., 339 U.S. 497, 512 (1950); Mabee v. White Plains Publishing Co., 327 U.S. 178, 183-184 (1946).

Citicorp Indus. Credit, Inc. v. Brock, 483 U.S. 27, 35 (1987).  In reviewing a case regarding whether workers were exempt from the National Labor Relations Act, the Supreme Court invoked the FLSA as an exemplar of a labor statute in which claimed exemptions must be narrowly construed:

> If a statute's meaning is plain, . . . reviewing courts "must give effect to the unambiguously expressed intent of Congress."  Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984).  When the legislative prescription is not free from ambiguity, the administrator must choose between conflicting reasonable interpretations. . . . [R]eviewing courts must take care to assure that exemptions . . . are not so expansively interpreted as to deny protection to workers the Act was designed to reach.  See [Holly Farms Corp. v. NLRB, 48 F.3d 1360, 1370 (4th Cir. 1995)] (citing NLRB v. Cal-Maine Farms, Inc., 998 F.2d 1336, 1339 (C.A.5 1993)); cf. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960) (exemptions from the FLSA "are to be narrowly construed against the employers seeking to assert them"); Mitchell v. Kentucky Finance Co., 359 U.S. 290, 295 (1959) ("It is well settled that exemptions from the Fair Labor Standards Act are to be narrowly construed.").

Holly Farms Corp. v. NLRB, 517 U.S. 392, 398-99 (1996) (footnote omitted).

The rule that repeals by implication are disfavored "applies with especial force when the provision advanced as the repealing measure was enacted in an appropriations bill."  Will, 449 U.S. at 221-22.  "Nevertheless, when Congress desires to suspend or repeal a statute in force, '[t]here can be no doubt that . . . it could accomplish its purpose by an amendment to an appropriation bill, or otherwise.'"  Id. at 222 (alteration in original) (quoting Dickerson, 310 U.S. at 555).  "The whole question depends on the intention of Congress as expressed in the statutes."  Id. (quoting United States v. Mitchell, 109 U.S. 146, 150 (1883)).

The Supreme Court in Will applied these precepts to determine that certain appropriations acts reflected a congressional intent to repeal or postpone previously enacted salary increases.  Id. at 221-22.  The Federal Circuit conducted a similar analysis in Moda Health Plan, Inc. v. United States to determine whether certain appropriations riders "supplied the clear implication of Congress's intent to impose a new payment methodology . . . or if Congress merely appropriated a less amount."  892 F.3d 1311, 1325 (Fed. Cir. 2018); see id.

("[A]cknowledging the general rule disfavoring repeals by implication and its 'especial force' when the alleged repeal occurred in an appropriations bill, the [Supreme] Court [in Will] held that in each of the four appropriations acts in question, 'Congress intended to repeal or postpone previously authorized increases.'"). Therefore, while repeals by implication are disfavored, and the FLSA is narrowly construed, the plain language of the statute and Congress's intent must be examined to determine whether the Appropriations Acts affect plaintiffs' overtime pay claims. The court is persuaded that the Appropriations Acts evince congressional intent to limit overtime payments to CBP employees for two principal reasons.

First, in each of the Appropriations Acts, Congress recognized that overtime pay for CBP employees was authorized by a number of different statutes, and expressly made the overtime pay cap set forth in 19 U.S.C. § 267(c)(1) applicable to overtime pay from all such sources. "Thus, 'for the time covered by those' appropriations bills, the intent of Congress was 'plain on the face of the statute,'" Moda, 892 F.3d at 1323 (quoting Mitchell, 109 U.S. at 150): Congress intended that no money from the Appropriations Acts should be used to pay any overtime for CBP employees beyond the $35,000 cap for that fiscal year. Because the Appropriations Acts "carried sufficient implication of . . . amendment[] or suspension of substantive law to effect that purpose," id. at 1323-24, the presumption against amendment by implication is overcome.

Second, certain of the Federal Circuit's dicta in Bull strongly suggests that CPB employees' FLSA claims are subject to overtime pay caps. The Federal Circuit observed:

> [T]here is no reason for concluding that recovery under the FLSA would circumvent the COPRA statutory cap on overtime compensation. From 1979 until 1994—a time period which extends both before and after the enactment of COPRA—all Customs employees who received overtime pay from any source were subject to the same annual cap. Thus, with or without the duplicative cap provided in 19 U.S.C. § 267(c)(1), a [Customs Canine Enforcement Officer ("CEO")] seeking overtime from non-COPRA sources would not have been able to receive more than $25,000. Even today, all Customs employees are subject to the same cap, regardless of the source of the overtime pay. Therefore, we have no reason to believe that our interpretation of COPRA as a non-exclusive regime will permit CEOs to circumvent the cap.

Bull, 479 F.3d at 1378 (footnotes omitted). In other words, the Federal Circuit reasoned that its conclusion that the COPRA displaced the FEPA but not the FLSA with respect to overtime compensation would have no effect on the overtime pay cap applicable to Customs employees. Thus, presumably, the CEOs—who established willful violations of the FLSA's overtime provisions, id. at 1379—would be able to recover overtime compensation to the extent that such compensation would not cause them to exceed the overtime pay cap for any given year. Although this dicta is not binding on the court, the Federal Circuit's suggestion that compensation for willful violations of the FLSA's overtime provisions is subject to the overtime pay cap is highly persuasive. See Nat'l Am. Ins. Co. v. United States, 498 F.3d 1301, 1306 (Fed. Cir. 2007) (remarking that courts are not bound by dicta but that merely because a statement is dicta does not mean that the statement is incorrect); Stone Container Corp. v. United States, 229 F.3d 1345, 1349 (Fed. Cir. 2000) (rejecting an invitation to disregard Supreme Court statements characterized as dicta, explaining that "[a]s a subordinate federal court, we do not share the

Supreme Court's latitude in disregarding the language in its own prior opinions"); see also Strickland v. United States, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005) ("Ordinarily, a trial court may not disregard its reviewing court's precedent.  There are two narrow exceptions:  if the circuit's precedent is expressly overruled by statute or by a subsequent Supreme Court decision.  Neither occurred here." (citations omitted)).

### C.  The Judgment Fund Is Not Available to Settle FLSA Claims in These Circumstances

Notwithstanding the congressional intent evinced in the Appropriations Acts to limit recovery of overtime pay to $35,000 per annum, plaintiffs contend that recovery of the full amount of overtime compensation is available from the Judgment Fund.  Plaintiffs are mistaken.

Pursuant to the Appropriations Clause, "no money can be paid out of the Treasury unless it has been appropriated by Congress." Cincinnati Soap Co. v. United States, 301 U.S. 308, 321 (1937).  "The Judgment Fund is a permanent, indefinite appropriation which is available to pay many judicially and administratively ordered monetary awards against the United States."  31 C.F.R. § 256.1(a) (2015); accord 31 U.S.C. § 1304 (2012) (providing that the Judgment Fund can be used "to pay final judgments, award compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law").  The Judgment Fund may only be used when "payment is not otherwise provided for . . . ." 31 U.S.C. § 1304(a)(1).  "Payment is otherwise provided for when another appropriation or fund is legally available to satisfy the judgment." Principles of Appropriations Law—Vol. III, 14-39 (3rd ed. 2008).

Because the Judgment Fund is a separate appropriation, it is not subject to the overtime pay cap in the Appropriations Acts.  However, when the Judgment Fund is invoked as a source of payment, there must be a separate source of liability for the payment:

> The Judgment Fund is a general appropriation of "[n]ecessary amounts" in order "to pay final judgments" and other amounts owed via litigation against the government, subject to several conditions.  The Judgment Fund "does not create an all-purpose fund for judicial disbursement."  Rather, access to the Judgment Fund presupposes liability.  [A] contention that the government's liability persists because it could pay what it owed under the statutory scheme from the Judgment Fund reverses the inquiry.  The question is what Congress intended, not what funds might be used if Congress did not intend to suspend payments . . . .

Moda, 892 F.3d at 1326 (citations omitted).  In other words, if Congress intended to limit recovery under a particular statutory scheme, the Judgment Fund cannot be used to provide compensation beyond that limit.

During the period in which plaintiffs' claims for overtime compensation accrued, Congress intended to prevent CBP employees from receiving more than $35,000 per annum in overtime pay.  Because CBP's liability to pay overtime compensation is limited to $35,000 per annum, the Judgment Fund cannot be used for overtime compensation in excess of that amount.  Accordingly, defendant is only authorized to pay plaintiffs, in settlement of their claims, overtime compensation in an amount that does not cause plaintiffs to receive more than $35,000 in overtime compensation per annum.

## IV. CONCLUSION

For the reasons articulated above, the court **GRANTS** defendant's motion for partial summary judgment and **DENIES** plaintiffs' cross-motion for partial summary judgment. The parties shall file a joint status report with the court **no later than Thursday, February 7, 2019**, suggesting further proceedings.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge